## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

LESLIE D. G.,[1]

     Plaintiff,

v.             ACTION NO. 2:22cv369

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,

     Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

   Leslie D. G. ("plaintiff") filed this action for review of a decision by the Commissioner

("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period

of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

*See* 42 U.S.C. §§ 405(g), 1383(c)(3).

   An order of reference assigned this matter to the undersigned.  ECF No. 11.  Pursuant to

the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure,

and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF

No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be

**GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.    PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on October 14, 2020, alleging she became disabled on July 1, 2018.  R. 195–96.[2]  Plaintiff later amended her alleged onset date to May 27, 2020.  R. 281.  Plaintiff alleges disability due to degenerative disc disease, right knee osteoarthritis, seizure disorder, bipolar disorder, major depression, and anxiety disorder.  R. 198.  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 63–71, 73–82, 99–100.  ALJ Jarrod Tranguch held a telephonic hearing on January 18, 2022.  R. 35–61.  The ALJ issued a decision denying benefits on March 2, 2022.  R. 12–34.  The Appeals Council denied plaintiff's request for review of the ALJ's decision on July 25, 2022.  R. 1–6.  Therefore, ALJ Tranguch's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on September 2, 2022.  ECF No. 1.  The Commissioner answered on November 8, 2022.  ECF No. 9.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on December 7, 2022 and January 5, 2023, respectively.  ECF Nos. 13–16.  Plaintiff filed a reply brief on January 26, 2023.  ECF No. 17.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.   RELEVANT FACTUAL BACKGROUND

Plaintiff argues that the ALJ erred in two respects.  First, plaintiff argues that the ALJ erred by not including any limits on pace in the residual functional capacity ("RFC") despite finding "moderate impairment" in concentrating, persisting, or maintaining pace ("CPP") at step three of the analysis. Pl.'s Br. In Supp. Mot. Summ. J. ("Pl.'s Br."), ECF No. 14, at 9–12.  Second, plaintiff contends that some jobs the vocational expert ("VE") testified that a person with similar characteristics to plaintiff could perform conflicted with plaintiff's mental abilities the ALJ set forth in the RFC.  *Id.* at 12–14.  As a result, plaintiff argues, the ALJ improperly relied on VE's testimony in denying benefits at step five.  *Id.*  The Court's review of the facts below is tailored to these arguments.

### A.   *Background Information and Hearing Testimony by Plaintiff*

At a hearing before the ALJ on January 18, 2022, plaintiff provided the following information.  At the time, the 40-year-old[3] was divorced and lived with her parents.  R. 42–43.  Plaintiff graduated high school and attended some college but did not earn a degree.  R. 43.  Plaintiff's last job was a "cleaning job," which she performed part-time for a brief period.  R. 43–44.  Plaintiff also previously worked as a merchandiser for several years for a few different companies and was later self-employed as a merchandiser.  R. 44–45.

Plaintiff testified that she primarily stopped working due to her bipolar and anxiety disorders.  R. 46.  She also conveyed that her car accident in May 2019 "put [her] over the edge" and she now suffers from "chronic back and knee pain."  *Id.*  She experiences stiffness, chronic aching, burning, "and just pain" in her lower back.  *Id.*  She also received some surgeries for her

---

[3] Plaintiff is considered a young individual under SSA rules.  For claimants under the age of fifty, the SSA "generally do[es] not consider that [their] age will seriously affect [their] ability to adjust to other work."  20 C.F.R. § 404.1563(c).

back but has "reached a point where . . . all [the doctors can] do is manage the pain." R. 46–47. She manages her pain with anti-inflammatory medications, light stretching, and laying down. R. 47. Plaintiff also has pain in both knees, with her right knee being worse, and needs knee replacements. R. 47–48. Additionally, she sometimes wears a knee brace when she walks. R. 48. When asked about her abilities and limitations due to her conditions, plaintiff stated she could: (a) lift and carry 10 to 15 pounds for a short distance; (b) walk 20 to 30 minutes without taking a break; (c) stand for close to 30 minutes before needing to sit; and (d) sit for 45 minutes before needing to change positions. R. 48–49.

When asked about her mental health, plaintiff stated that she has "intense highs with racing unorganized thoughts . . . [and] intense lows where . . . it's hard to get out of bed." R. 50. She explained that she sleeps a lot and has a fear of the public and difficulty focusing. *Id.* She testified that her mental health has impacted her concentration by making her "scattered," which makes it difficult to get out of bed and get dressed. R. 51. She also has trouble with her memory and will "go over something and then . . . the next day [she] won't quite remember what [she went] over." *Id.*

Plaintiff's mental health treatment has included group counseling, seeing an addiction specialist, and seeing a psychiatrist for her mood disorder. R. 50. She was involuntarily committed for her mental health issues but testified that she was feeling "much better" at the time of the hearing. R. 55. Plaintiff has a history of substance abuse and was clean for just over a year at the time of the hearing. R. 50. She takes several medications for her conditions that have caused fatigue and weight gain. R. 51.

Plaintiff also testified about her daily activities. Due to mental health issues, plaintiff's mother handles her finances and drives her to the grocery store. R. 52. Plaintiff can do some light

chores such as dishes and laundry.  R. 52–53.  Plaintiff also reads, watches TV, listens to music, and occasionally draws and "do[es] art," but does not have a social life outside of her family.  R. 53.

Moreover, plaintiff indicated in an adult function report, dated January 20, 2021, that she walks and feeds her pets, reads the news, makes her bed, cooks "a couple times a week," occasionally mows the grass, and does not drive because of her car accident.  R. 208–15.  She stated that her bipolar disorder makes it hard to focus, concentrate, and follow through with tasks. R. 213.  She also said that she does not handle stress or changes in routine well.  R. 214.  However, plaintiff can follow written instructions "well" but has a harder time with oral instructions.  R. 213.

## B. *Hearing Testimony by Vocational Expert*

VE Linda Augins testified at the hearing.  R. 56–60.  Based on the ALJ's hypotheticals, VE Augins found that someone with plaintiff's age, education, work history, and RFC could not perform plaintiff's past relevant work, but could perform certain light jobs in the national economy—such as merchandise marker, mail sorter, and photocopy machine operator.  R. 56–58. In a second hypothetical posed to VE Augins where a person similar to plaintiff had a sedentary exertional level, VE Augins testified that the individual could perform the job of an envelope addresser, document preparer, and ticket counter.  R. 58.  Lastly, VE Augins testified that if an individual needed "unscheduled breaks," "would tend to be off task at least 20 percent of the workday," "would be late to work, absent from work, or would need to leave early from work at least two days per month on an unscheduled and unplanned basis," then that individual would be precluded from work.  R. 59.

## C.    *Relevant Mental Health Medical Record*[4]

### 1.    Sentara Health and Virginia Beach Psychiatric Center

Prior to plaintiff's amended alleged onset date of May 27, 2020, plaintiff presented at the hospital with mental health concerns and was seen for outpatient treatment.

On April 13, 2020, plaintiff presented at Sentara Virginia Beach General Hospital with vague suicidal ideation, paranoia, and delusions. R. 579–81. Plaintiff believed people were following her and that "her girlfriend wants to kill her" and stated that her girlfriend pulled a gun on her, choked her, and tapped her phone. R. 581. The record revealed that plaintiff was "trying rehab" and had used drugs twice in the past two months. R. 582. Plaintiff denied homicidal ideations, denied any hallucinations or delusions, and declined to pursue detox. R. 586. Plaintiff admitted to using methamphetamine before coming to the emergency department. R. 587.

Subsequently, plaintiff was seen several times at Sentara Behavioral Health for intensive outpatient treatment for her "[p]olysubstance dependence, codependency, legal issues, anxiety, [and] depression." R. 566–79. Plaintiff "struggled with adhering to attendance guidelines and communicating effectively with group facilitators" and was discharged. R. 567 ("Patient did not make any progress during IPO group. Patient only attended 4 full IOP groups and has just beg[u]n focusing on ways to work on her goals.").

Again, on May 14, 2020, 13 days before plaintiff's amended alleged onset date, plaintiff presented at the Sentara Princess Anne Hospital in police custody. R. 558. She was admitted for THC and methamphetamine use and was hallucinating. *Id.* Plaintiff could not state her name and

---

[4] Due to plaintiff amending her alleged onset date to May 27, 2020 from July 1, 2018 and plaintiff's contention regarding her ability to concentrate, persistent, and maintain pace, the Court limits the recitation of the record to reflect only what is relevant to plaintiff's contentions. *See* R. 15; Pl.'s Br. 9–12.

was "very lethargic [and] confused." R. 561. A few hours later, plaintiff was awake, oriented, and cooperative and did not remember what happened. R. 562. She stated that she had "been a drug addict her whole life" and was discharged with the officer back to jail. *Id.*

On May 27, 2020, plaintiff's amended alleged onset date, plaintiff was admitted to Virginia Beach Psychiatric Center and was discharged on June 1, 2020. R. 504. Initially, plaintiff presented at Sentara Virginia Beach General Hospital in police custody and was cleared medically but needed further inpatient psychiatric assistance. R. 553–54 ("[Plaintiff] was picked up today because she was making homicidal statements that she was going to kill her ex-wife and burn[] down her house."). A bed was located at the Virginia Beach Psychiatric Center and plaintiff's care was transferred. R. 557–58.

Once she was transferred, plaintiff stated that "her wife ha[d] been sleeping with [her] mom, [her] dad, [her] boyfriend and may be [sic] [her] dog" and that she had been having angry outbursts towards her wife. R. 504. Plaintiff detailed her history of abusing "all drugs" in the past and had two psychiatric hospitalizations for detox. *Id.* She admitted to using "some wine with meth a few days ago." *Id.* Plaintiff further indicated that she had been on Suboxone for the past 18 years and had not taken any other opiates in the past 15 years other than methadone and Suboxone. *Id.* She denied feeling depressed and any history of depression and stated that her only issues were addiction and family issues. *Id.* Plaintiff was admitted on a "temporary detainment order due to psychotic features" and was diagnosed with methamphetamine-induced psychosis, opiate dependance, and mood disorder, not otherwise specified. R. 506. Upon discharge, plaintiff was not suicidal or homicidal and she had a pending appointment with an outpatient psychiatrist. *Id.*

Plaintiff continued to receive treatment at Sentara Virginia Beach Medical Center in the intensive outpatient program for her addiction and mental health issues. R. 522–48. During her treatment, plaintiff continually stated that she was having relationship issues with her wife and had legal trouble as a result. R. 526, 528, 532, 537, 539–40, 542–43. As her outpatient treatment progressed, she became more self-reflective and demonstrated improved insight. *See e.g.*, R. 523, 526. Plaintiff also stated that part of her relapse prevention plan was to engage in hobbies such as refurbishing furniture, walking, writing, and creating art. R. 525; *see* R. 527 ("[Plaintiff] identified that she is focusing on her sobriety by acquiring new hobbies such as . . . exercising, reading, and hanging out with her family."). Upon discharge from the outpatient treatment on August 25, 2020, plaintiff reported a significant improvement in her mood, and was "able to focus on current symptoms, triggers, and coping skills." R. 522. She was tolerating her medications well and "was tearful but was oriented on all spheres." *Id.*

### 3.     First Colonial Family Practice

In September and October 2020, plaintiff was seen at First Colonial Family Practice by Physician Assistant ("PA") Katherine K. Malbon. R. 1285, 1288, 1292. Plaintiff's exams revealed that her insight and judgment were good, her mood and affect were normal, she was active and alert, and her recent and remote memory were normal. R. 1287, 1291, 1294. Plaintiff had some weight gain, which she suggested was from her mental health medication. R. 1290. Plaintiff reported having no depression, anxiety, emotional problems or concerns, and no psychiatric symptoms. R. 1290.

Plaintiff had another visit with PA Malbon on May 28, 2021. R. 3417. Plaintiff stated that she had been dizzy and fatigued for four days and had gained 60 pounds in the last year despite

working out three hours a day and eating once a day. R. 3419. Her mental status exam noted that she was alert and oriented. R. 3420.

### 4.    Right Path Addiction Treatment Centers

Between May 2020 and November 2021, plaintiff was seen extensively at Right Path Addiction Treatment Centers, including group therapy sessions, for her mental health conditions. *See, e.g.*, R. 1356–60, 2073–75, 3434–3625.

Throughout 2020–2021, plaintiff talked extensively about her domestic issues with her wife and the legal issues that resulted from the relationship. *See, e.g.*, R. 1674–75 (noting that on May 4, 2020, plaintiff's chief complaint was that she had domestic issues with her wife and was on house arrest following a recent incident); R. 1716 (discussing domestic issues on June 10, 2020 visit); R. 1755 (noting plaintiff's unresolved domestic issues on July 3, 2020 visit). Early on in her treatment, plaintiff experienced cravings and other symptoms due to her drug addiction. *See* R. 1674 (noting on May 4, 2020, plaintiff was experiencing cravings, muscle aches, and pains and did not report any symptoms related to medications). But as treatment progressed, she had learned to cope better and was having less cravings. *See, e.g.*, R. 1767 (noting on July 17, 2020, plaintiff's chief complaint was opiate dependence and she said "she is doing well and seems to have gone past that hump"); R. 1782 (noting on August 14, 2020, plaintiff cravings were not significant, but she had low energy); R. 1900 (noting on December 16, 2020, plaintiff had signs of withdrawal relieved with medication); R. 1927, 1933 (noting on January 6, 2021 plaintiff had an increase in cravings and drug dreams at night but her affect was "[b]right and appreciative of her recovery"); R. 2153 (noting on March 3, 2021, that plaintiff reported that she is no longer experiencing increased cravings or drug dreams). Additionally, as her legal issues resolved, her mental health improved. *See, e.g.*, R. 1900, 1906 (noting on December 16, 2020, that plaintiff's criminal charges

9

were "dropped" and normal findings upon examination).   Throughout her visits, plaintiff's physical exams were "normal" and generally revealed that she was well groomed, appropriately dressed, pleasant, cooperative, coherent, her affect was appropriate, and her mood was euthymic. R. 1806 (September 11, 2020 visit); R. 1830–31 (October 9, 2020 visit); R. 1869–89 (December 4, 2020 visit); R. 2159 (March 3, 2021 visit); R. 2186 (March 31, 2021 visit); R. 2223 (April 28, 2021 visit); *see also* R. 1727 (noting on June 16, 2020, plaintiff was "well adjusted to coping with unpleasant circumstances and well adjusted to societal changes occurring around her"); R. 1772–73 (noting on July 17, 2020, plaintiff's mood was dysphoric, her affect was appropriate introverted, her attitude was pleasant, cooperative, coherent, she was appropriately dressed, and she was alert, oriented, well appearing, and well nourished); R. 1788 (noting on August 14, 2020 that plaintiff "look[ed] her best lately," her mood was dysphoric, and her affect was appropriate).   There were was notations that plaintiff was "overweight," which appeared to result from plaintiff's medication and eating habits, which improved over time. *See, e.g.*, R. 1801 (noting on September 11, 2020 that plaintiff was working out but gained 20 pounds due to liking ice cream); R. 1846 (noting on November 6, 2021, plaintiff had gained 20 pounds due to "liking ice cream/carbs"); R. 2122 (noting on February 3, 2021 that plaintiff was well appearing but overweight); R. 2179 (noting on March 31, 2021 plaintiff was exercising and losing weight); R. 3466, 3520–21 (noting on June 23, 2021 plaintiff was frustrated about difficulty losing weight despite daily workouts, but her attitude was "better now" and by August 18, 2021 she had lost 12 pounds); R. 3491, 3498 (noting on July 21, 2021 that plaintiff appearance is "looking better each time").   Plaintiff's labs also continuously came back with no indication of illicit drug use. *See, e.g.*, R. 1777, 1835, 2163, 2190, 2227, 3450, 3477, 3531, 3558.

Plaintiff also attended many group therapy sessions between 2020 and 2021. During these sessions, plaintiff discussed her abusive relationship and difficulties staying sober. R. 1817 (discussing that plaintiff removed herself from her abusive relationship); R. 1893 (during the December 15, 2020 session plaintiff reported that she is "not doing ok" and had been "feeling urges and cravings" and had not "felt this way in a while"). As she continued to attend and participate in these sessions, she started to be more reflective, optimistic, and make positive changes to her life. *See* R. 1950 (stating that she was "grateful for every day that [she was] not in jail" and that she now values "the little things" that she used to "take for granted"); R. 2139 (noting on February 23, 2021, that plaintiff actively participated, and stated that she is "doing ok" and now has "inner peace"); R. 2176 (noting on March 30, 2021, that plaintiff stated that she was doing well and demonstrated optimism about living life sober and was engaging in physical activity); R. 2210 (noting on April 22, 2021, that plaintiff was "doing well with her recovery" and made positive changes in her life by getting out of her toxic relationship). Plaintiff started to engage with her hobbies and was doing better after her court case was resolved. R. 1839 (discussing that plaintiff was getting out more); R. 2208 (noting on April 8, 2021, that plaintiff was a bit stressed over court problems but that it was "cleared up now"); R. 3541 (noting on August 30, 2021, that plaintiff's legal case was "dropped" and she was "happy with how things are going" and that "she is getting back into her hobbies like . . . going on long walks"). Plaintiff continually reported that she was doing well and that her medications were working. *See, e.g.,* R. 1817 (September 30, 2020); R. 1839 (October 20, 2022); R. 1950 (January 12, 2021); R. 2107 (January 20, 2021); R. 3462 (June 21, 2021); R. 3516 (August 3, 2021).

5.     **Alpha Psychiatric Services, LLC**

Plaintiff was also seen a few times from November 2020 to June 2021 at Alpha Psychiatric Services, LLC by PA Krista Grimmett.  R. 2042–43, 3429.  Plaintiff was seen for medication management, bipolar disorder, anxiety, and narcotic addition.  *Id.*  Her initial visit apparently on October 7, 2020,[5] due to her desire to transfer her psychiatric care from Right Path Addiction Treatment Centers.  R. 2068–71.  Plaintiff stated that her medications have helped her "become more stable" but have led to weight gain.  R. 2068.  She stated that her legal issues regarding her ex-wife have increased her anxiety.  *Id.*  In the next few sessions, plaintiff started to see improvement in her mental health.  Plaintiff stated her medications were "working well" and she was experiencing "less stress" now that her legal case was over.  R. 2042.  Plaintiff was also "walking more" and was losing weight after stopping Zyprexa.  *Id.*  Further, plaintiff "[n]oticed a major improvement in mood" and family members saw "a positive change."  *Id.*

On April 14, 2021, plaintiff denied anxiety, depression, or having any difficulty concentrating.  R. 2044.  She also stated that "things have been stable," she denied depression or mania, her anxiety was well controlled, her sleep was adequate, and she had no medication side effects.  R. 2042.  Following a mental status exam on the same day, PA Grimmett reported that she was stable, alert, and oriented in all spheres with full range of affect, her mood was normal, her thought process was goal directed and logical, her insight and impulse control were normal, her attitude was cooperative, her concentration was appropriate, and her memory was normal.  R. 2044.

---

[5] It is unclear whether the date of her initial visit was October 7, 2020 or November 4, 2020.  *See* R. 2064–71.  Both visits state that it was plaintiff's "initial visit" and the notes from the visits are identical.  *Compare* R. 2064 ("A 39 year old Caucasian female presents for an initial visit."), *with* R. 2068 (same).

Lastly, on June 9, 2021, plaintiff presented for a follow-up visit. R. 3429. Plaintiff reported that her depression, anxiety, and narcotic addition were "well under control." *Id.* And, although plaintiff was still struggling with weight gain, she was exercising and eating healthy. *See id.*

### 6.    Coastal Psychiatric Services

The record only indicates that plaintiff was seen twice at Coastal Psychiatric Services by PA Grimmett. R. 3639–44. Her initial visit was on September 8, 2021, on referral from Alpha Psychiatric Services. R. 3642. She was being seen for bipolar disorder, anxiety, and narcotic addition. *Id.* A physical exam revealed that plaintiff was alert, had good eye contact, was fairly well groomed, was well nourished, had normal speech, was oriented to date, time, place, and person, her attention and concentration span were intact, her immediate recall was intact, her short- and long-term memory were intact, her mood was euthymic, her thought content was goal directed, coherent, and relevant, she had no delusions, hallucinations, or obsessive thoughts, her judgment and insight were intact, her prognosis was good to average, and her symptoms were controlled. R. 3643.

Later, plaintiff had a follow-up "regarding disability paperwork" on December 1, 2021—which is the same day PA Grimmitt filled out a medical source statement. R. 3633, 3639. PA Grimmitt's notes state that plaintiff "has an extremely hard time holding a job due to her mental illness and difficulty interacting with the public," but that plaintiff's narcotic addiction was controlled with medications, bipolar disorder was stable, and that she denied depression. R. 3639. Plaintiff was tolerating her medications well and continued to follow her treatment plan. *Id.* PA Grimmitt's objective examination found that plaintiff had normal speech, was oriented with date, time, place, and person, had average intelligence, her attention and concentration span were intact, her immediate recall was intact, her short- and long-term memory were intact, her mood was

anxious, her affect was "in congruence with [her] mood," she had no suicidal or homicidal thoughts, her thought content was goal directed, coherent, and relevant, she did not have delusions, hallucinations, or obsessive thoughts, and her functional status was stable. R. 3639–40. However, PA Grimmitt noted that plaintiff's judgment and insight were impaired, and her prognosis was guarded. R. 3640.

**D.   *Medical Opinions***

1.   **State Agency Consultants' Review—February and June 2021**

In February 2021, state agency consultant Howard Leizer, Ph.D., and Bert Spetzler, MD, reviewed plaintiff's medical record. R. 63–71. The initial disability determination found that plaintiff had severe impairments of disorders of the back (discogenic and degenerative); osteoarthrosis and allied disorders; depressive, bipolar and related disorders; and anxiety and obsessive-compulsive disorders. R. 66. Further, the state consultants found plaintiff's substance addiction disorders (drugs) and substance addiction disorders (alcohol) as non-severe.[6]  *Id.*

Dr. Leizer evaluated plaintiff under the criteria for the following listings:  12.04 for depressive, bipolar and related disorders, and 12.06 for anxiety and obsessive-compulsive disorders. R. 66–67. As to plaintiff's sustained concentration and persistence limitations, Dr. Leizer rated the plaintiff as "moderately limited" in her ability to carry out detailed instructions;

---

[6] Plaintiff's argument is focused on her CPP limitations. Pl.'s Br. 9–12. Plaintiff's moderate limitations in CPP, as discussed by the ALJ, were a result of plaintiff's mental impairments. R. 19–20. Further, only the state agency mental health consultants discussed plaintiff's CPP limitations. R. 63–71, 73–82. Plaintiff's brief does not discuss any of the state agency findings, Pl.'s Br. 9–12, and the defendant's memorandum only discusses the state agency mental health consultants' findings, Def.'s Mem. 12–18. Therefore, the Court will focus its discussion and recitation of the facts on the opinions of the state agency mental health consultants. However, the Court notes that the ALJ did analyze the state agency medical consultants' findings, Drs. Spetzler and Staehr, and found their opinions persuasive. R. 26–27.

14

maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.[7] R. 69. Notably, after rating plaintiff's sustained concentration and persistence limitation, Dr. Leizer gave a narrative explanation stating that "[a]lthough the claimant may have difficulty sustaining performance of detailed tasks, given her overall mental state, objectively the evidence shows the claimant to be capable of understanding, recalling, and carrying out simple, routine tasks with minimal social demands over a normal workday/workweek."[8] R. 69.

In June 2021, state agency consultants Richard Milan, Jr., Ph.D., and Patricia Staehr, MD, reviewed plaintiff's medical record. R. 73–82. On reconsideration, the experts found the same severe and non-severe impairments, apart from finding disorders of the skeletal spine as severe and omitting disorders of back (discogenic and degenerative). R. 76. Dr. Milan evaluated plaintiff for the same listings as Dr. Leizer and assessed plaintiff with the same limitations. *Compare* R. 66–69, *with* R. 80. Furthermore, Dr. Milan provided the same narrative explanation after rating the plaintiff's sustained concentration and persistence limitations. R. 80. Dr. Milan also evaluated the medical source statement performed by PA Grimmett in February 2021, and found that, while giving the opinions "consideration in the assessment of the claim," "[t]he claimant has some

---

[7] In social interaction and adaptation limitations, Dr. Leizer rated plaintiff as "moderately limited" in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. R. 69.

[8] Dr. Leizer also gave a narrative explanation after rating plaintiff's social interaction and adaptation limitation. *See* R. 69–70.

limitations in these areas but not enough to limit her from performing simple, routine work." R. 78.

### 2.   Medical Source Statements by PA Krista Grimmett—February and December 2021

On February 26, 2021, PA Grimmett completed a medical source statement. R. 2029. PA Grimmett noted that plaintiff had the following diagnosis: bipolar II disorder, narcotic addition, and generalized anxiety disorder (GAD). *Id.* PA Grimmett noted that plaintiff had the following symptoms: anhedonia; disturbed mood; mood swings; decreased energy; malaise; difficulty with focus/concentration; personality change; isolation/emotional withdrawal; persistent anxiety; anxiety attacks; and racing thoughts. *Id.* She concluded that plaintiff had no impairment in carrying out short and simple instructions and had an "extreme" impairment dealing with normal work stressors. *Id.* PA Grimmett found plaintiff had "marked" limitations in the remaining work-related activities—maintaining concentration/focus; getting along with the general public, co-workers, and supervisors; performing at a consistent pace; and responding to changes in routine. *Id.* Further, PA Grimmett estimated that plaintiff would be absent from work "4+ days/month" due to her mental health problems. *Id.*

On December 1, 2021, PA Grimmett completed another medical source statement. R. 3633. PA Grimmett noted that plaintiff had the same conditions but instead of narcotic addiction PA Grimmett changed the diagnosis to substance use disorder. *Id.* PA Grimmett noted that plaintiff had the same symptoms as previously noted with the following additions: appetite disturbance; sleep disturbance; blunt, flat, or inappropriate affect; feelings of guilt/worthlessness; memory loss; flight of ideas; delusional thinking; paranoid thinking; and impairment of impulse control. *Id.* She concluded that plaintiff had "marked" impairment in carrying out short/simple instruction and getting along with co-workers and supervisors and "extreme" impairment in

maintaining concentration/focus, getting along with the general public, performing at a consistent pace, responding to changes in routine, and dealing with normal work stressors. *Id.* PA Grimmett also estimated the same number of absences from work as before. *Id.*

## III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[9] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 15–28.

The ALJ found that plaintiff met the insured requirements[10] of the Social Security Act through December 31, 2022, and had not engaged in substantial gainful activity from July 1, 2018, her alleged onset date of disability.[11] R. 17.

---

[9] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[10] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

[11] Although this was plaintiff's original alleged onset date, it was later amended to May 27, 2020. *See* R. 15, 281.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) degenerative disc disease of the lumbar spine and thoracic spine (status-post lumbar laminectomy); (b) T12 chance fracture (status-post surgeries and fusion); (c) degenerative joint disease of the right knee; (d) bipolar disorder; (e) generalized anxiety disorder; and (f) substance abuse disorder. *Id.* The ALJ classified plaintiff's impairment of hepatitis C as non-severe and found that there was "no actual diagnosis in the evidence" of plaintiff's seizure disorder. R. 18. The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 18–21. As for plaintiff's mental impairments, the ALJ found that plaintiff had a mild limitation in understanding, remembering, or applying information; moderate limitation interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting and managing oneself. R. 20–21.

The ALJ next found that plaintiff possessed the residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations that she: (a) "can occasionally balance, stoop, kneel, crouch, use ramps and climb stairs"; (b) "can perform jobs that do not require crawling or climbing on ladders, ropes, or scaffolding"; (c) "can perform jobs[] that would take no more than 30 days of training to learn with a specific vocational preparation level two, which are generally classified as unskilled"; (d) "can understand, remember, and carry out simple instructions"; (e) "can perform simple and routine tasks"; (f) "can perform jobs that would be considered 'low stress' in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting"; (g) "can have occasional interaction with coworkers and supervisors"; and (h) "can perform jobs in which she

18

would have no more than rare or incidental contact with customers or members of the general public." R. 21.

Based on this RFC, the ALJ found at step four that plaintiff could not perform any past relevant work as a merchandiser. R. 27. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs, such as merchandise marker, mail sorter, and photocopying machine operator. R. 28.

Accordingly, the ALJ concluded plaintiff was not disabled from May 27, 2020,[12] through March 2, 2022, the date of the ALJ's decision, and was ineligible for a period of disability or DIB. R. 28.

## IV.  STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

---

[12] Though concluding that plaintiff was not disabled, on the last page of the decision the ALJ recites the initial alleged onset date (July 1, 2018), rather than the amended onset date (May 27, 2020). R. 15, 28.

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F. 3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

### A.    *The ALJ sufficiently explained why additional limitations in the RFC were unnecessary, notwithstanding plaintiff's moderate limitation in concentration, persisting, and maintaining pace.*

Plaintiff argues that the ALJ, having found a moderate limitation[13] in concentrating, persisting, or maintaining pace ("CPP"), ignored plaintiff's mental limitations in determining plaintiff's RFC. Pl.'s Br. 9–12. Plaintiff contends that Fourth Circuit precedent "requires that when an ALJ finds 'moderate' impairment in CPP, the RFC must include limits on pace." *Id.* at 9 (citing *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015)). However, plaintiff states that there are two exceptions to this requirement: (1) "the ALJ provides an explicit and well-reasoned rationale for why he did not include limits on pace in the RFC," *id.* at 9–10 (citing *Shinaberry v. Saul*, 952 F.3d 113 (4th Cir. 2020)); or (2) "the RFC, while not explicitly addressing pace, includes other

---

[13] A moderate limitation means that a claimant's ability to function in an area "independently, appropriately, effectively, and on a sustained basis is fair." POMS § DI 34001.032(F)(2)(C), https://secure.ssa.gov/apps10/poms.nsf/lnx/0434001032 (last visited March 7, 2023).

limitations that implicitly address pace," *id.* at 10 (citing *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017)). Plaintiff contends that neither exception applies because "[n]owhere in the ALJ's decision did he explain why he decided not to include any limits on pace in the RFC despite finding 'moderate' impairment in CPP," *id.* at 9–10, and the ALJ's RFC "did not include any other limitations that implicitly address pace," *id.* at 10. Plaintiff concedes that the RFC does contain the following mental limitations: (1) "unskilled work at SVP 2 taking less than 30 days to learn"; (2) "understand, remember, and carry out simple instructions"; (3) "simple and routine tasks"; (4) "occasional, simple decision making"; (5) "occasional, gradual changes in work duties and work setting"; (6) "occasional interaction with co-workers and supervisors"; and (7) "rare or incidental contact with customers or the general public." *Id.* That said, plaintiff asserts that none of these limitations explicitly or implicitly addresses pace. *Id.* at 10–11 (discussing cases holding that limits on social interaction, simple routine tasks, or unskilled work are not limits on pace (citing *Courtney L. v. Saul*, No. 2:20cv174, 2021 WL 2046712 (E.D. Va. May 5, 2021), *report and recommendation adopted*, 2021 WL 2042462 (E.D. Va. May 21, 2021)); *Xavier S. v. Saul*, No. 1:19cv1195, 2020 WL 1015816 (E.D. Va. Mar. 2, 2020))).

The Commissioner argues that the ALJ need not incorporate in the RFC the moderate limitation in CPP that he found at step three, Mem. Supp. Def.'s Mot. Summ. J. and in Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 16, at 12–13; rather, he states, a court "should consider whether it can meaningfully review the ALJ's findings on the claimant's ability to perform mental work-related functions," *id.* at 13 (citing *Shinaberry*, 952 F.3d at 121–22)). The Commissioner contends that the ALJ "sufficiently reviewed and discussed the record and reasonably accounted for Plaintiff's credibly established limitations." *Id.* at 15. The Commissioner further argues that the ALJ considered the plaintiff's testimony about her CPP limitations—such as tiredness and

21

difficultly finishing projects and getting out of bed—but found that the symptoms conflicted with the evidence. *Id.* at 16. Further, the Commissioner contends, that the ALJ reviewed plaintiff's medical record and, upon finding the state agency mental health experts' opinions persuasive, the ALJ adopted their CPP limitations in the RFC. *Id.* ("These experts also assessed 'moderate' limitations in concentrating, persisting, or maintaining pace, but that Plaintiff could handle 'simple, routine tasks with minimal social demands' in a low stress work environment. With those restrictions, she could perform work 'over a normal workday/workweek.'"). The Commissioner notes that the ALJ also found PA Grimmett's opinions unpersuasive and thus did not incorporate her far greater limitations concerning plaintiff's CPP. *Id.* And, he states that the RFC is consistent with the ALJ's review and findings in plaintiff's medical record and the plaintiff "offers no meaningful response or challenge to the ALJ's analysis." *Id.* at 18. Therefore, the Commissioner concludes that because substantial evidence supports the ALJ's RFC and a court can easily "fathom the [ALJ's] rationale in relation to evidence in the record," remand is not appropriate under *Mascio. See id.* (quoting *Britt v. Saul*, 860 F. App'x 256, 262 (4th Cir. 2021)).

Plaintiff's reply clarifies that she is not asking for a categorical rule, rather she is seeking a case-by-case analysis that looks at "whether the RFC limitations, where there is 'moderate' impairment in CPP, address limits on pace." ECF No. 17, at 3. Plaintiff also cites various cases within the Eastern District of Virginia[14] and the Fourth Circuit to support the contention that the ALJ's failure to explain how the limits contained in the RFC account for limits on pace or, in the alternative, why limits on pace may be inapplicable, requires a remand. *Id.* at 1, 4. Having

---

[14] Plaintiff also lists cases since 2021 where she contends that the Commissioner has voluntarily remanded "cases on the precise legal issue presented in this case." *See* ECF No. 17, at 1.

considered the parties' contentions, the Court finds that the ALJ satisfied the requirements of *Mascio* for the reasons set forth below.

As part of the five-step sequential analysis, an ALJ must determine a claimant's residual functional capacity, or RFC. *See* 20 C.F.R. § 404.1545. The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis in original). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements based on limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* In determining a claimant's RFC, the ALJ must consider all relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3).[15] The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). *Id.* at § 404.1545(a)(5).

In conducting the RFC analysis, the Fourth Circuit has made clear that an ALJ must provide an adequate narrative discussion to allow for substantial evidence review, including an explanation of any internal inconsistencies within the ALJ's decision. *See Thomas v. Berryhill*, 916 F.3d 307, 311–13 (4th Cir. 2019). In particular, the Fourth Circuit has found that an ALJ who finds that a claimant has a moderate limitation in CPP at step three must reconcile that finding with the RFC

---

[15] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

determination. *See Mascio*, 780 F.3d at 638. And, limiting the RFC to simple or routine tasks, or unskilled work does not account for limitations on pace. *Id.* ("[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). Accordingly, upon finding mental functional difficulties at step three, an ALJ must either: (a) include limitations in the RFC to account for the same; or (b) explain "why [the] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the claimant's RFC]." *Id.*

When the ALJ chooses the latter path—explaining why the moderate limitation does not translate into a limitation in the RFC—the ALJ must engage in sufficient analysis and explanation for a court to meaningfully review those conclusions. *See Carol F. v. Saul*, No. 2:19cv155, 2020 WL 3966829, at *9 (E.D. Va. June 9, 2020), *report and recommendation adopted*, 2020 WL 3960579 (E.D. Va. July 13, 2020), *aff'd*, No. 20-1985, 2022 WL 1090254 (4th Cir. Apr. 12, 2022) ("[I]f an ALJ explains why moderate deficits in concentrating, persisting, or keeping pace do not necessitate additional limitations in a claimant's RFC, no remand is needed if the explanation adequately addresses why such deficits do not affect a claimant's ability to work."). A few Fourth Circuit decisions demonstrate this point. In *Shinaberry v. Saul*, the Court found that the ALJ's review and discussion of the pertinent evidence—such as the state agency consultants' mental health assessments and consultative examination findings, as well as Shinaberry's adult function report—"sufficiently explained why the mental limitation to simple, routine, and repetitive tasks accounted for Shinaberry's borderline intellectual disability and her moderate limitations in . . . concentration, persistence[,] or pace." *Shinaberry*, 952 F.3d at 121–22. Additionally, in *Sizemore v. Berryhill*, the state agency psychological consultant and the ALJ determined that the claimant

had "moderate difficulties" in CPP. *Sizemore*, 878 F.3d at 80. Yet, the state agency psychological

consultant "made more detailed findings" regarding claimant's CPP and explained

> [T]hat while [claimant] was moderately limited with respect to his ability (1) to carry out detailed instructions; (2) to perform activities within a schedule, maintain regular attendance, and be punctual; and (3) to complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, he nonetheless would generally be able to maintain [attention] for at least two [hours] at a time as needed to do simple, routine tasks and was thus mentally capable of independently performing basic, routine tasks on a sustained basis.

*Id.* at 80–81 (internal quotations omitted). Another state agency consultant also came to a similar

conclusion. *Id.* at 81. Therefore, the Court held that the state agency experts' opinions "provided

substantial support for the ALJ's finding that, despite [claimant's] overall moderate difficulties

with concentration, persistence, or pace, he would nonetheless be able to stay on task while

performing 'simple one, two-step tasks,' as long as he was 'working in low stress non-production

jobs with no public contact.'" *Id.*; *see also Perry v. Berryhill*, 765 F. App'x 869, 872 n.1 (4th Cir.

2019) (noting "the ALJ in *Sizemore* provided additional context" and included "descriptors" such

as "without any 'fast-paced work' or 'public contact' . . . to explain the restriction intended");

*Hunter v. Berryhill*, No. 3:17cv112, 2018 WL 310138, at *13–14 (E.D. Va. Jan. 5, 2018)

(upholding an RFC specifying work "not at production rate," along with limitations for simple and

routine tasks, only occasional changes in routine work setting, and no public and only occasional

supervisory interaction).

　　The Court has also addressed this same issue. For example, in *Carol F. v. Saul*, the Court

ruled that despite claimant's moderate limitations in CPP, the ALJ adequately reviewed the record

and explained why claimant could perform and work on a daily and weekly basis. *Carol F.*, 2020

WL 3966829, at *8–9. The Court explained how the ALJ sufficiently discussed and took

plaintiff's medical record into account when fashioning the RFC. *Id.* at *10–11. The Court stated

that because the ALJ "found that plaintiff's self-assessment of her physical and mental health conditions and their effects failed to fully align with the evidence of record, that her mental health conditions generally responded well to medication . . . the ALJ reasonably concluded she 'experience[s] some . . . limitation, but only to the extent described in the [RFC]." *Id.* at *11. Therefore, the Court found that the ALJ satisfied the requirements of *Mascio*. *Id.* at *8; *see, e.g., Matthew P. v. Saul*, No. 1:19cv1191, 2020 WL 7391297, at *8 (E.D. Va. Nov. 23, 2020), *report and recommendation adopted*, 2020 WL 7398838 (E.D. Va. Dec. 16, 2020) ("[T]he ALJ sufficiently discussed plaintiff's testimony and the medical evidence pertaining to limitations in concentration.").

In contrast, the Court ruled in *Williams v. Saul* that the ALJ did not provide an adequate explanation about why the RFC did not include moderate limitations in CPP and therefore the requirements of *Mascio* were not met. *Williams v. Saul*, No. 3:18cv564, 2019 WL 3729016 (E.D. Va. July 22, 2019), *report and recommendation adopted*, 2019 WL 3728269 (E.D. Va. Aug. 7, 2019). The Court stated that "the ALJ's assignment of great weight" to the state agency consultants' opinions "failed to satisfy the ALJ's duty to explain why Plaintiff's moderate limitations in concentration, persistence and pace did not translate into limitations beyond those that the ALJ included in the RFC." *Id.* at *19. Although the consultants found plaintiff "moderately limited" in her ability to perform "at a consistent pace without an unreasonable number and length of rest periods," the ALJ "included no explanation in her opinion as to why these findings did not translate into an RFC restriction addressing Plaintiff's ability to stay on task." *Id.*

Here, the Commissioner is correct that *Mascio* "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a

specific limitation in the RFC." *Shinaberry*, 952 F.3d at 120–21. However, the plaintiff is not asking the Court to impose a *per se* rule. Rather, plaintiff argues that that the ALJ violated *Mascio* by not including limitations in the RFC that account for plaintiff's moderate limitation in CPP and by failing to explain why such limitations were unnecessary. *See* ECF No. 17, 3–4. Therefore, the Court must determine whether the ALJ complied with *Mascio* and subsequent precedent.

At step three, the ALJ reviewed plaintiff's mental functional capacities and found her to be moderately limited in concentrating, persisting, or maintaining pace. R. 20; *see* R. 20–21 (also examining her abilities to process information, interact with others, and adapt and manage herself). The ALJ then undertook the "more detailed" "mental [RFC] assessment used at steps 4 and 5." R. 21–27. Based on this review, the ALJ's RFC specified the following non-exertional, mental limitations and restrictions: (1) "perform jobs that would take no more than 30 days of training to learn with a specific vocational preparation level two, which are generally classified as unskilled"; (2) "understand, remember, and carry out simple instructions"; (3) "perform simple and routine tasks"; (4) "perform jobs that would be considered 'low stress' in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting"; (5) "have occasional interaction with coworkers and supervisors"; and (6) "perform jobs in which she would have no more than rare or incidental contact with customers or members of the general public." *Id.* at 21. Notably, absent further explanation, limitations such as "handling simple instructions; making simple work-related decisions; reducing interaction with others; pertaining to changes in work situations and routines; performing simple, routine, and repetitive work; are directed to matters other than questions of persistence and pace." *Della G. v. Saul*, No. 4:20cv124, 2021 WL 2677917, at *13 (E.D. Va. May 25, 2021), *report and recommendation adopted*, 2021 WL 2672010 (E.D. Va. June 29, 2021) (citing *Courtney L.*, 2021 WL 2046712, at

*7–8); *see also Perry*, 765 F. App'x at 872 (holding that the ALJ erroneously accounted for "limitations in concentration, persistence and pace" only by restricting plaintiff to "unskilled work"); *Persinger v. Comm'r of Soc. Sec.*, No. 6:15cv1377, 2016 WL 4063373, at *6 (M.D. Fla. July 29, 2016) ("[A] limitation to 'simple 1–5 step' tasks that 'can be performed independently after 30 days of training,' does not adequately account for limitations in 'attention and concentration for extended periods,' i.e., persistence, or pace."). Therefore, for the ALJ to satisfy *Mascio*, he must sufficiently explain why plaintiff retained the ability of work without the need to incorporate limitations in the RFC. *See Della G.*, 2021 WL 2677917, at *14.

Here, in step three of the analysis, the ALJ explained the "moderate limitation" regarding CPP. R. 20. Citing to the hearing testimony and medical records, the ALJ noted that the claimant has a driver's license, is tired due to her medications, has difficulty concentrating due to mental health issues such as starting one project and not finishing it, and has trouble getting out of bed some days. *Id.* Further, the ALJ noted that the plaintiff enjoys reading, watching TV, listening to music, drawing, and creating art, and in July 2020 she enjoyed working on and rehabbing old furniture. *Id.* Considering listings 12.04 and 12.06, the ALJ did not find the claimant's mental disorder "serious and persistent." R. 21.

At step four, as part of ALJ's overall RFC assessment, the ALJ discussed and considered medical and other evidence in the record, including: (1) plaintiff's symptoms; (2) her hearing testimony; (3) her physical and mental health conditions, including treatment; (4) the response of her conditions to medication and treatment; (5) her daily activities and hobbies; and (6) medical opinions of her treating physician's assistant and state agency consultants. R. 22–27.

Notably, after reviewing and detailing plaintiff's hearing testimony about her medical and mental conditions, the ALJ found that although "the claimant's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 23. The ALJ noted that, although plaintiff has a "significant history of polysubstance addiction" and other mental health conditions, her mental health examination findings were mostly normal. R. 24–26. For example, PA Grimmett reported in February 2021 that plaintiff "had not been having cravings and noticed a major improvement in mood" and she did not have highs or lows. R. 26. Further, in July 2020, Sergey Zhitar, MD, examined plaintiff and concluded that plaintiff had a mostly normal mental examination. R. 24 ("She was alert and oriented.  She was cooperative and coherent.  Her speech was normal and clear.  She had an appropriate introverted affect and a dysphoric mood.").

The ALJ next addressed the medical opinions of PA Grimmett and the state agency consultants. The ALJ found PA Grimmett's medical source statement "not persuasive because it is not consistent with the treatment records." R. 25. PA Grimmett found that the plaintiff had an "'extreme' level of impairment in her ability to maintain concentration/focus, get along with the general public, perform at a consistent pace, respond to changes in routine and deal with normal work stress." R. 25. However, PA Grimmett's objective exam findings differed from the findings in the medical source statement.[16] R. 25. For example, on September 8, 2021, PA Grimmett found plaintiff's attention span and concentration to be intact and her immediate recall and long- and short-term memory intact. R. 25. Further, on the same date as the medical source statement,

---

[16] The ALJ also states that PA Grimmett only saw plaintiff one time before filling out the medical source statement. R. 25. Although it is true that PA Grimmett only saw plaintiff once at Coastal Psychiatric Services before filling out the medical source statement, R. 3633, 3642–44, plaintiff was seen by PA Grimmett at Alpha Psychiatric Services approximately seven times prior to completing the medical source statement. R. 2042–43, 3429.

December 1, 2021, PA Grimmett indicated that plaintiff reported that her mood was stable, she denied depression, her sleep was controlled with medication, she felt her symptoms were managed with medication, and her attention and concentration were intact, among other normal findings. R. 25. The ALJ also noted that earlier treatment records showed plaintiff's mental status examinations were normal. R. 25–26 (noting that in April 2021 plaintiff's thought content was normal, thought process was logical, her insight and judgment were intact, her attention was normal, and her concentration was appropriate). Additionally, plaintiff herself reported that "things [had] been stable," "denied depression or mania," "reported no side effects" from medications, her sleep was "adequate and sound," and "her anxiety was well controlled." R. 25–26.

Important to the issue at hand, however, the ALJ found the opinions of the psychological consultants, Dr. Howard Leizer and Dr. Richard Milan, Jr., to be persuasive.[17] R. 26–27. Both consultants found that plaintiff had moderate limitations in CPP. *Id.* Both consultants, however, opined and explained what this limitation meant relative to plaintiff's ability to sustain work on a daily and weekly basis. *See* R. 69, 80. Both consultants concluded that "[a]lthough the claimant may have difficulty sustaining performance of detailed tasks, given her overall mental state, objectively the evidence shows the claimant to be capable of understanding, recalling, and carrying

---

[17] Notably, Dr. Milan had the benefit of PA Grimmett's first medical source statement when applying the psychiatric review technique at the reconsideration level. *See* R. 77 (noting that Dr. Milan's review took place on May 28, 2021); R. 2029 (PA Grimmett's initial medical source statement dated February 26, 2021). Dr. Milan noted that plaintiff was "stable and adequately managed" at her April 2021 medication evaluation, that her "[mental status exam] intact [with] [follow-up] planned for three months, [and] [n]o evidence of decompensation or substantial limitation of functioning." R. 77. Therefore, Dr. Milan agreed with the initial decision and found that the decision "is supported and consistent with objective medical evidence." *Id.* The ALJ then used Dr. Milan's statement in concluding that PA Grimmett's medical source statements were not persuasive. R. 25–26.

out simple, routine tasks with minimal social demands over a normal workday/workweek." R. 69,
80. As explained in *Jason M.H. v. Kijakazi*, it is this kind of narrative explanation following the
mental activity ratings that constitutes the consultants' mental RFC. *Jason M. H. v. Kijakazi*, No.
4:22cv12, 2022 WL 18276851, at *4–6 (E.D. Va. Dec. 22, 2022) (finding that the narrative
explanations following the mental activity ratings represent the state agency consultants' mental
RFC), *report and recommendation adopted*, 2023 WL 174958 (E.D. Va. Jan. 12, 2023).  Here, the
ALJ expressly referenced the consultants' RFC findings, including those addressing plaintiff's
ability to sustain work, when explaining his RFC determination.  R. 26.  The ALJ then adopted
and substantially incorporated the state agency psychological consultants' mental RFC into his
RFC finding.  R. 26 ("The undersigned Administrative Law Judge finds this opinion persuasive
and has included in the claimant's residual functional capacity above limitations consistent with
this opinion.").

      Similar to *Carol F.* and *Shinaberry*, the ALJ relied on the state agency mental health
experts'—Dr. Leizer and Dr. Milan—findings that, despite plaintiff's moderate limitations in CPP,
she is "capable of understanding, recalling, and carrying out simple, routine tasks with minimal
social demands over a normal workday/workweek," in determining plaintiff's RFC.  R. 21, 26.  In
fact, the ALJ recited verbatim the state agency consultants' narrative explanations when analyzing
the consultants' opinions.  *Compare* R. 26 ("[A]lthough the claimant may have difficulty
sustaining performance of detailed tasks, given her overall mental state, objectively the evidence
shows the claimant to be capable of understanding, recalling, and carrying out simple, routine tasks
with minimal social demands over a normal workday/workweek.  The claimant may be able to
interact superficially with others in the work setting.  Her stress-tolerance level may be of some
concern and she likely will have trouble dealing with the stressors encountered in many work

situations[.] Consequently, work should be low in social and mental demands. The claimant can adjust to occasional changes in work setting and procedure."), *with* R. 69–70, 80–81 (same). The ALJ found these opinions persuasive and consistent with PA Grimmett's examination findings. *Id.* Therefore, unlike in *Williams*, the ALJ credited the state agency consultants' opinions and in doing so adequately explained why further limitations in the RFC were unwarranted. *See Williams*, 2019 WL 3729016, at *19 (citing *Greer v. Colvin*, No. 1:14cv143, 2016 WL 1367745, at *8 (M.D.N.C. Apr. 6, 2016)).

The record demonstrates that, consistent with Fourth Circuit precedent and Eastern District of Virginia case law, the ALJ discussed and took the foregoing into account in fashioning the RFC and concluding that plaintiff can perform "a range of light unskilled work within the . . . parameters" set forth in the RFC. R. 27. Accordingly, because the ALJ reviewed and discussed the record and appropriately accounted for plaintiff's limitations that were supported by record evidence, a remand is unnecessary.

**B.** *The ALJ did not err in relying on the VE's testimony at step five of the analysis.*

At step five, the ALJ found that plaintiff could perform work as a merchandise marker, mail sorter, and photocopying machine operator. R. 28. At the hearing, when VE Augins was provided with a second hypothetical,[18] which contained more limitations and changed the exertional level to sedentary, VE Augins testified that the individual could perform work as an envelope addresser, document preparer, and ticket counter. R. 58. However, the ALJ did not rely

---

[18] For the second hypothetical, the ALJ added that the individual could only perform jobs that would be at "the sedentary exertional level." R. 58. The ALJ also added limitations that the individual could only "occasionally perform pushing and/or pulling motions with the lower extremity such as operating pedals or foot controls," could not perform jobs that would require kneeling, and could not perform jobs that "involve exposure to workplace hazards such as unprotected heights and dangerous moving machinery." R. 58.

on VE Augins' testimony regarding the ALJ's second hypothetical when denying benefits at step five. *See* R. 28.

Plaintiff asserts that there is an apparent conflict between the Dictionary of Occupational Title ("DOT") description of mail sorter, document preparer, and ticket counter as requiring reasoning level three, and ALJ's RFC limits on plaintiff's ability to only perform "unskilled" and "simple and routine tasks," which is inconsistent with reasoning level three jobs. Pl.'s Br. 12–14 ("The apparent conflict between the RFC limiting [plaintiff] to 'unskilled' and 'simple and routine tasks' and the DOT's [reasoning level three] requirement of the Mail Sorter, Document Preparer, and Ticket Counter was not acknowledged by the VE or ALJ. As such, this apparent conflict remains unresolved.").

The Commissioner argues that, regardless of any conflict between the job as a mail sorter and the plaintiff's ability to perform a job that is a reasoning level three, there are still two other jobs plaintiff could perform that are available in significant numbers in the national economy. Def.'s Mem. 18–19. Plaintiff concedes that the two other jobs the ALJ relied on at step five— merchandise marker and photocopying machine operator—do not have this conflict. *Id.* at 19; Pl.'s Br. 14 n.9 (admitting that merchandise marker and photocopying machine operator do not conflict with the DOT). Therefore, any error related to the job as a mail sorter is irrelevant to the outcome of plaintiff's claim because two job still exist in significant numbers in the national economy. Def.'s Mem. 19.

An ALJ must reasonably resolve any apparent conflict between the VE's testimony and the DOT, as argued by plaintiff. Pl.'s Br. 12; *see Marvin J. v. Kijakazi*, No. 2:20cv356, 2021 WL 3719274, at *15 (E.D. Va. July 30, 2021), *report and recommendation adopted*, 2021 WL 3711179 (E.D. Va. Aug. 20, 2021) (explaining that the ALJ must independently identify whether any

apparent conflicts exist, seek an explanation from the VE for any such conflict, and address whether the VE's explanation is reasonable and provides a basis for relying on the VE's testimony rather than the DOT (citing *Pearson v. Colvin*, 810 F.3d 204, 208–11 (4th Cir. 2015))).  However, under 20 C.F.R. § 404.1566(b), there only needs to be "one or more occupations" available in significant numbers in the national economy for the Commissioner to meet his burden at step five. Here, the ALJ found that, consistent with VE Augins' testimony and information contained in the DOT, plaintiff could perform three jobs that require a full range of light work—merchandise marker, mail sorter, and photocopying machine operator.[19]  R. 28.  Even if the job of a mail sorter required reasoning level three and conflicted with the RFC, two other jobs remain—merchandise marker (68,000 jobs nationally) and photocopying machine operator (25,000 jobs nationally)— that plaintiff could perform.  R. 28; *see* Pl.'s Br. 14 n.9; *Rosalyn G. v. Kijakazi*, No. 2:21cv275, 2022 WL 1311473, at *9 (E.D. Va. Apr. 15, 2022), *report and recommendation adopted*, 2022 WL 1304538 (E.D. Va. May 2, 2022) ("To satisfy the burden at step five, the ALJ must identify only <u>one</u> occupation, if jobs in that occupation exist in significant numbers." (citing 20 C.F.R. § 404.1566(b))); *Doby v. Kijakazi*, No. 1:21cv00035, 2022 WL 2255713, at *13 (W.D. Va. June 23, 2022) (denying remand because one of the three jobs the VE found the plaintiff could perform was not in conflict with the ALJ's RFC finding).  Accordingly, because plaintiff concedes that two jobs remain that are not in conflict with the RFC, and because such jobs are available in significant numbers in the national economy, plaintiff's motion for a remand should be **DENIED**.

---

[19] Although plaintiff also argues that the jobs of document preparer and ticket counter require a reasoning level three, those two jobs were only discussed at the hearing in the second hypothetical posed to VE Augins, which considered a sedentary exertional level rather than a light range of work, and were not relied on at step five of the ALJ's decision. *See* R. 28, 58.

## VI.   <u>RECOMMENDATION</u>

For the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

## VII.   <u>REVIEW PROCEDURE</u>

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
March 7, 2023